# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Karin Sue Boardway,                    )
                                       )
    Plaintiff,                     )
                                       )
       v.                        )     Case No. 3:17-cv-30069-KAR
                                       )
Nancy A. Berryhill,                    )
Acting Commissioner of Social          )
Security Administration,               )
                                       )
    Defendant.                     )


## MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
(Docket Nos. 13 & 15)

ROBERTSON, U.S.M.J.

## I.    INTRODUCTION

Karin Sue Boardway ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of a final decision of the Acting Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Plaintiff applied for DIB and SSI on July 21, 2014, alleging a May 3, 2013 onset of disability, due to problems stemming from a variety of impairments, including:  fibromyalgia; degenerative disc disease ("DDD"); obesity; bursitis; migraines; asthma; plantar fasciitis; osteoarthritis; depression; and attention deficit disorder ("ADD") (A.R. at 113, 454, 507). [1]  On February 25, 2016, the Administrative Law Judge

---

[1] A copy of the Administrative Record (referred to herein as "A.R.") has been provided to the court under seal (Dkt. No. 10).

("ALJ") found that Plaintiff was not disabled and denied her application for DIB and SSI (*id*. at 302-319). The Appeals Council remanded the case to the ALJ to explain the discrepancy between Plaintiff's primary care physician's ("PCP") opinion regarding Plaintiff's limitations and the ALJ's determination of Plaintiff's residual functional capacity ("RFC") (*id.* at 322-23). Further, the Appeals Council directed the ALJ to indicate the weight she afforded the state agency medical consultants' opinions (*id.*). After a re-hearing on October 13, 2016, the ALJ again found that Plaintiff was not disabled and denied Plaintiff's DIB and SSI claims (*id*. at 111-32). The Appeals Council denied review (*id*. at 1-4) and thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

Plaintiff appeals the Commissioner's denial of her claim on the ground that the decision is not supported by "substantial evidence" under 42 U.S.C. § 405(g). Pending before this court are Plaintiff's motion for judgment on the pleadings requesting that the Commissioner's decision be reversed or remanded for further proceedings (Dkt. No. 13), and the Commissioner's motion for an order affirming the decision of the ALJ (Dkt. No. 15). The parties have consented to this court's jurisdiction (Dkt. No. 12). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons stated below, the court will grant the Commissioner's motion for an order affirming the decision and deny Plaintiff's motion.

II.     LEGAL STANDARDS

A.      Standard for Entitlement to Disability Insurance Benefits and
        Supplemental Security Income

In order to qualify for DIB and SSI, a claimant must demonstrate that she is disabled within the meaning of the Social Security Act.[2]  A claimant is disabled for purposes of DIB and SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is unable to engage in any substantial gainful activity when she

> is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA").  *See* 20 C.F.R. § 404.1520(a)(4)(i-v).[3]  The hearing officer must determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from dong any work considering the claimant's

---

[2] There is no challenge either to Plaintiff's insured status for purposes of entitlement to DIB, *see* 42 U.S.C. § 423(a)(1)(A), or to her financial need for purposes of entitlement to SSI, *see* 42 U.S.C. § 1381a.

[3]  The administrative regulations applicable to Title II DIB are found in 20 C.F.R. Part 404, while the regulations applicable to Title XVI SSI are found in 20 C.F.R. Part 416.  Because the Title II and Title XVI regulations do not differ substantively, the court refers only to the Title II regulations in this Memorandum and Order.

age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate RFC.  *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations.  *Goodermote*, 690 F.2d at 7.

B.    Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).  Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652,

655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id.* (citing *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir. 1999) (per curiam)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citing *Sprague v. Dir., Office of Workers' Comp. Programs*, *U.S. Dep't of Labor*, 688 F.2d 862, 865 (1st Cir. 1982)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Irlanda Ortiz*, 955 F.2d at 769. So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id.* at 770. That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

III.   FACTS

A.   Plaintiff's Background

Plaintiff is married and has three children (A.R. at 455, 496). She was 40 years old when she applied for DIB and SSI on July 21, 2014 (*id.* at 454). At the time of the re-hearing before the ALJ in October 2016, Plaintiff was 42 years old and lived with her husband and children, ages eight and eleven (*id.* at 150). Plaintiff graduated from high school and worked full-time as an administrative assistant from 1991 to 2003 and as a defibrillator assembler from 2004 to 2009

(*id.* at 138). She was employed as a part-time personal care assistant from 2009 to 2012 (*id.* at 138). Plaintiff had not worked since 2012 (*id.* at 138).

B.     <u>Plaintiff's Physical Condition</u>

Plaintiff alleges that the ALJ erred by failing to assign controlling weight to the two opinions of her PCP, Elizabeth Armstrong, M.D., of the Riverbend Medical Group ("Riverbend"). Because Dr. Armstrong's opinions were based on her assessment of Plaintiff's lumbar DDD (back) and fibromyalgia, the court focuses on Plaintiff's medical history that is related to those two conditions.

1.     Back

In June 2014, Plaintiff reported to Robert N. Shapiro, M.D. of Baystate Neurosurgery that she had been experiencing back pain for about three years (*id.* at 670).

On September 21, 2012, Dr. Armstrong referred Plaintiff for physical therapy ("PT") to treat her back, hip, and leg pain and to maintain her remaining strength, balance, and range of motion (*id.* at 766). Dr. Armstrong indicated that it was "imperative" that Plaintiff remain active (*id.*).

On January 11, 2013, Plaintiff was evaluated at NovaCare Rehabilitation due to back pain (*id.* at 835, 861). Her plan of care diagnosis was lumbago of the spine (*id.* at 858). The record reflects that pain caused moderate limitations in Plaintiff's range of motion, muscular performance, and the capacity to climb stairs, walk, sit, stand, sleep, and work (*id.* at 858-59). The therapist indicated that Plaintiff's "overall rehabilitation potential" was "good" and recommended that she attend aquatic therapy session three times a week for four weeks to decrease pain and to increase function, range of motion, and strength (*id.* at 858-64). Plaintiff attended a therapy session on February 6, 2013 (*id.* at 851-53). The March 4, 2013 record from

NovaCare Rehabilitation indicated that she had not attended recently scheduled therapy sessions due to "a personal medical issue" (*id.* at 844). On March 4, 3013, the physical therapist noted that aquatic therapy had increased the range of motion and flexibility of Plaintiff's back and had reduced her pain (*id.*). The last NovaCare record of March 20, 2013 stated that Plaintiff should continue with the current rehabilitation plan (*id.* at 836-37).

On July 26, 2013, Tony Tannoury, M.D. of the Boston Medical Center's Department of Orthopedic Surgery noted that the recent MRI of Plaintiff's cervical spine was "normal" and the MRI of her lumbar spine "was predominantly normal with a tiny L4-L5 annular tear with L5 transitional vertebra" (*id.* at 614). She was advised to start a course of PT or to exercise on her own (*id.*). Dr. Tannoury further recommended that she "stay out of surgery for as long as possible" (*id.* at 615). When Plaintiff saw Dr. Tannoury for a follow-up visit on August 30, 2013, he "strongly recommended" that she join fitness and weight loss programs (*id.* at 618). The results of the radiological views of her lumbar spine showed: the "suggestion of transitional lumbosacral anatomy;" "well maintained" vertebral body heights and disc spaces; "grossly normal" alignment; "degenerative changes with facet hypertrophy of the lower lumbar spine;" and "multilevel marginal anterior osteophytes" (*id.* at 610).

On January 17, 2014, Plaintiff visited Dr. Tannoury complaining of low back pain of 10 on a scale of 10 and bilateral leg pain of 6 on a scale of 10 (*id.* at 612). Plaintiff reported that her legs were numb (*id.*). The doctor observed that Plaintiff's gait was antalgic, favoring the right side (*id.* at 612). He ordered an MRI which showed that "[n]ormal lumbar lordosis [was] preserved without evidence of acute fracture or subluxation," "[v]ertebral body heights and intervertebral disc spaces [were] maintained," "[t]here [were] mild degenerative changes . . . from L4-S1 with small anterior endplate osteophytes and posterior facet hypertrophy," "limited

anteroposterior range of motion with flexion and extension with no obvious subluxation," and unremarkable paravertebral soft tissues (*id.* at 613, 616). An MRI at Mercy Medical Center in Springfield a month later revealed mild caudal facet arthropathy (*id.* at 827). There was no disc herniation, central stenosis, or foramenal stenosis (*id.*).

On February 10, 2014, Plaintiff told her gynecologist that her health had been "good" since her last exam (*id.* at 702).

On June 30, 2014, Dr. Shapiro of Baystate Neurosurgery examined Plaintiff and reviewed an MRI (*id.* at 670-71). Dr. Shapiro noted that Plaintiff had "a very healthy and normal-looking MRI" (*id.*). He noted that her discs were well hydrated (*id.* at 671). Although she had a lumbarized S1 where the S1-S2 disc space was "somewhat larger than normal," Dr. Shapiro characterized this as a "normal anatomical variant" (*id.*). He further observed that Plaintiff had some facet hypertrophy and T2 signal changes in the facet joints at L4-5 and L5-S1, "but no compression of any sort anywhere" (*id.*). He indicated that there was "no surgical recourse" (*id.*). Because he opined that "a lot of her pain is related to deconditioning and obesity," he referred her to Baystate Weight Loss (*id.*).

On January 8, 2015, Plaintiff was evaluated by Erin Watson, D.O. of Pioneer Spine and Sports Physicians P.C. ("PSSP") after referral by Peter Kassis, M.D. of Riverbend on October 20, 2014 (*id.* at 816-19, 958). Plaintiff complained of "stabbing" back pain (*id.* at 816). Her gait was non-antalgic (*id.* at 817). According to the records, she indicated that she did not exercise (*id.*). A Butrans patch was prescribed for pain (*id.* at 818).

At Plaintiff's March 18, 2015 visit to PSSP, her spine was "[g]rossly normal to inspection," and her cervical lordosis, thoracic kyphosis, lumbar lordosis, and active range of

motion were normal (*id.* at 921). The available MRI reports showed normal discs (*id.*). Dr. Watson noted that the Butrans patch "provide[d] some benefit" and increased the dosage (*id.*).

During Plaintiff's March 5, 2015 visit to Dr. Armstrong, the physician discussed Plaintiff's back, leg, hip, and joint pain (*id.* at 955). Dr. Armstrong indicated that that it was "imperative" for Plaintiff "to maintain whatever remaining function she ha[d] in her joints, and to maintain her muscle tone" (*id.*).

On April 24, 2015, Plaintiff complained to PSSP of pain on her right side over her PSIS and buttock radiating to her lateral thigh (*id.* at 916). At that visit, she stood "comfortably erect" and walked with a slight antalgic gait, but did not use an ambulatory device (*id.* at 917). PT and counseling were recommended and Butrans was continued because it supported her daily activities (*id.* at 918). A note from Plaintiff's July 21, 2015 visit to PSSP indicated: "She was offered PT at her last visit, though did not attend;" and "[s]he did not avail herself of chronic pain counseling which was suggested at the last visit" (*id.* at 935).

On September 2, 2015, the Noble Hospital Sports and Rehabilitation Center conducted a PT evaluation of Plaintiff with the goal of formulating a program to relieve her low back pain (*id.* at 1032-35, 1038-40). According to the evaluator, Plaintiff's rehabilitation potential was "good" (*id.* at 1035). She was a "no show" on September 15, 2015 and was discharged because of "poor attendance" (*id.* at 1037, 1049).

A note from Plaintiff's September 28, 2015 visit to PSSP indicated that she had not been able to attend PT sessions due to a "conflict of interest with time" (*id.* at 931). Julia L'Heureux, F.N.P., examined Plaintiff and made the following observations of her spine: normal contour; no atrophy, deformity, ecchymosis, scoliosis, or spinal curvature; no tenderness with palpation of the greater trochanters, latissimus dorsi, levator scapulae bilaterally, paravertebral facet area

bilaterally, trapezius or trochanteric bursa bilaterally; moderate pain with palpation of the PSIS, SI joint, and right piriformis muscle (*id.* at 932). Plaintiff's posture was normal, and her spine and hip range of motion was "physiologic" (*id.*). The reverse straight leg raise, straight leg raise, and trunk rotation were negative bilaterally (*id.*). In summary, L'Heureux noted that Plaintiff's presentation suggested sacroiliac pain (*id.* at 933). She further noted that the "current opiate regime allow[ed] [Plaintiff] to ambulate independently and perform simple and instrumented activities of daily living independently" without significant side effects from the medication (*id.* at 933). L'Heureux referred Plaintiff to Baystate weight management for evaluation and treatment of obesity (*id.*).

On October 8, 2015, Plaintiff walked with a normal gait pattern when she was evaluated for PT at PSSP (*id.* at 964). The therapist indicated that Plaintiff would benefit from a "program of gradual progression core stabilization, stretching," and other interventions and noted that "[r]ehab potential is good" (*id.* at 965). The medical records indicate that she attended PT on October 15 and 21, 2015 and November 19, 2015 (*id.* at 967-70, 1084-85). On October 21, the therapist noted that Plaintiff tolerated treatment and new exercises well (*id.* at 969).

A November 18, 2015 x-ray of Plaintiff's lumbosacral spine conducted by the Arthritis Treatment Center revealed "[n]ormal sagittal alignment of 4 non-rib bearing lumbar vertebra plus a lumbosacral transitional vertebra that is referred to as L5 with a sacralized L5S1 disc" (*id.* at 1082). Vertebral body heights were preserved, there were no compression fractures, the L1L2 through L4L5 intervertebral disc spaces were maintained without significant endplate sclerosis or spurring (*id.*). The overall impression was of "[v]ariant lumbosacral transitional vertebra" and "no significant degenerative disc disease" (*id.*). An x-ray of Plaintiff's sacroiliac joints that was conducted on the same day showed normal joints and sacrum (*id.* at 1083). Antonio Valentin,

M.D. of the Arthritis Treatment Center noted that Plaintiff's x-rays were "unremarkable and showed no significant degenerative or inflammatory changes" (*id.* at 1058). Upon examination, Plaintiff's lumbosacral spine appeared normal and exhibited no muscle spasms (*id.* at 1061). Palpation revealed tenderness but no abnormalities (*id.*).

On January 8, 2016, when Plaintiff saw Dr. Armstrong and asked her to complete a disability form, Plaintiff reported that she had not attended PT sessions because of "transportation and insurance issues" (*id.* at 1095). Plaintiff told Dr. Armstrong, "PT did not seem to be helping anyway" and reported that she was taking "chronic narcotics" (*id.*).

The record from Plaintiff's January 21, 2016 visit to PSSP states that she was unable to attend PT due to "illness" (*id.* at 1073). It was noted that she did not exercise (*id.* at 1074). L'Heureux stated that the current medication permitted Plaintiff to ambulate independently and to perform "simple and instrumented" daily living activities (*id.* at 1075). She was referred for a bilateral sacroiliac joint injection and S1 to S3 lateral branch blocks in the sacroiliac ligaments to relieve her diagnosed sacroiliitis (*id.* at 1075, 1077).[4]

On January 27, 2016, Dr. Valentin's examination of Plaintiff's lumbar region was unchanged since her November 2015 visit, except that it exhibited no tenderness on palpation (*id.* at 1055).

Claude Borowsky, M.D. of PSSP administered the bilateral sacroiliac joint injection and S1 to S3 lateral branch blocks in the sacroiliac ligaments on February 16, 2016 (*id.* at 1077-78).

---

[4] "'The term sacroiliitis is used to describe any inflammation in the sacroiliac joint, which is located on either side of the sacrum (lower spine) that connects to the iliac bone in the hip.'" *Forbes v. Colvin*, No. CA 14-249-M-PAS, 2015 WL 1571153, at *3 n.3 (D.R.I. Apr. 8, 2015) (further citation omitted).

On March 3, 2016, Plaintiff reported that the injection caused 20-30% improvement in her low back pain (*id.* at 1067). Dr. Borowsky administered a bilateral L4-L5 facet injection on June 28, 2016 (*id.* at 1076). Plaintiff reported a 20% improvement of her low back pain on July 12, 2016 (*id.* at 1140). PSSP notes from February, March and July 2016 indicated that Plaintiff did not exercise (*id.* at 1067, 1071, 1140).

### 2. Fibromyalgia

On September 21, 2012, Dr. Armstrong of Riverbend recommended that Plaintiff "find a low-impact form of exercise (walking, swimming or yoga) that she will be able to do several times per week" for relief of fibromyalgia symptoms (*id.* at 766).

James R. Schumacher, M.D. a rheumatologist at Riverbend, evaluated Plaintiff on January 18, 2013 (*id.* at 740). The examination revealed that Plaintiff had full range of motion without pain in her hands, elbows, knees, ankles, and feet (*id.* at 742). She had full range of motion with mild pain in her wrists and shoulders (*id.*). Dr. Schumacher noted that Plaintiff's wrist and knee joints were tender and that her diffuse and widespread tenderness was consistent with fibromyalgia (*id.* at 743). Dr. Schumacher repeated his fibromyalgia opinion on February 15, 2013, administered a corticosteroid injection to Plaintiff's left lateral hip, and recommended that she "restart" sulindac to relieve pain (*id.* at 739). The Riverbend physician's assistant's note of March 19, 2013 indicated that Plaintiff had not taken sulindac because she feared that it would get stuck in her throat (*id.* at 728). On April 29, 2013, Plaintiff complained to Dr. Schumacher about "widespread pain" involving her neck, shoulders, lateral hips, lower back, and knees (*id.* at 724). The doctor noted that Plaintiff had discontinued sulindac because she did not think it helped her (*id.*). He stated, "Mostly she seems to have fibromyalgia" (*id.* at 726). Dr.

Schumacher saw no signs of synovitis and ruled out rheumatoid arthritis (*id.*). He prescribed Robaxin and encouraged light aerobic activity (*id.* at 726-27).

On September 28, 2015, L'Heureux of PSSP assessed Plaintiff's fibromyalgia as: "18/18 points are positive and 3 control points are negative (*id.* at 933).

On January 8, 2016, Plaintiff reported having poor concentration, which Dr. Armstrong described as "'fibro fog'" (*id.* at 1095). Dr. Armstrong "strongly encouraged" Plaintiff to follow up with her physiatrist and to notify the physiatrist if PT did not help instead of discontinuing it on her own (*id.* at 1098).

On August 18, 2016, Dr. Armstrong reiterated that it was important for Plaintiff to maintain the remaining function in her joints and her muscle tone and again encouraged her to engage in "low impact exercise" to relieve the fibromyalgia symptoms (*id.* at 1367).

C.    The RFC Assessments

1.    State Agency Reviewers

a.    November 2014

K. Malin Weeratne, M.D., a nonexamining medical consultant, assessed Plaintiff's RFC on November 11, 2014 (*id.* at 248). Based on the doctor's review of Plaintiff's records, he opined that she could: (1) lift 20 pounds occasionally and 10 pounds frequently; (2) stand and/or walk and sit, with normal breaks, for about six hours in an eight hour work day; and (3) push and/or pull without limitation (*id.* at 246-47). He determined that Plaintiff was limited to climbing ladders/ropes/scaffolds occasionally and should avoid concentrated exposure to extreme cold, fumes, odors, gases, poor ventilation, and hazards (*id.* at 247-48). His opinion regarding Plaintiff's RFC was based, in part, on the records that reflected the consistently unremarkable

MRIs of Plaintiff's lumbar spine and the absence of arthritis or synovitis notwithstanding "trigger points consistent with fibromyalgia" (*id.* at 248).

Dr. Weeratne further supported his opinion with the interviewer's face-to-face observations of Plaintiff in the SSA's district office for more than two hours on July 22, 2014 (*id.* at 248, 509-10). During the interview, Plaintiff did not have any difficulty giving coherent answers to all questions, sitting, standing, or walking (*id.* at 509). While in the office, Plaintiff cared for two young children and did not demonstrate "much discomfort in [her] back or other places" (*id.*).

In November 2014, nonexamining consultant Peter Robbins, Ed.D. opined that Plaintiff might become distracted at times, but could recall simple work instructions (*id.* at 249-50). Dr. Robbins indicated that, in his opinion, Plaintiff would be able to sustain adequate pace, persistence, and concentration for simple competitive work tasks (*id.*).

        b.    March 2015

In March 2015, Howard D. Bronstein, M.D. generally agreed with Dr. Weeratne's assessment of Plaintiff's RFC, but indicated that, in addition to the postural limitations Dr. Weeratne noted, Plaintiff was limited to occasionally climbing ramps and stairs and stooping (*id.* at 279). Dr. Bronstein's assessment of Plaintiff's environmental limitations mirrored Dr. Weeratne's, but Dr. Bronstein found no basis to limit Plaintiff's exposure to extreme cold (*id.* at 280).

        2.    Dr. Armstrong

        a.    March 5, 2015

On March 5, 2015, Dr. Armstrong completed Plaintiff's application for discharge of a federal student loan on the basis that she was totally and permanently disabled (*id.* at 832). Dr.

Armstrong opined that Plaintiff's lumbar DDD and fibromyalgia were medically determinable impairments that prevented Plaintiff from engaging in any substantial gainful activity in any field of work and had lasted for a continuous period of not less than 60 months or could be expected to last for a continuous period of not less than 60 months (*id.*).  Dr. Armstrong indicated that Plaintiff's symptoms – severe discomfort in her back and extremities, numbness/intermittent weakness of her extremities, and severe fatigue – limited Plaintiff's ability to stand or walk for more than ten minutes, to sit for more than fifteen minutes, and to lift more than 15 pounds (*id.*). According to Dr. Armstrong, Plaintiff's activities of daily living were limited by the facts that she no longer drove, needed help with housework, and had difficulty concentrating (*id.*).

      b.    January 8, 2016

On January 8, 2016, Dr. Armstrong completed a form regarding Plaintiff's ability to perform "work-related activities on a day-to-day basis in a regular work setting" (*id.* at 1029). Based the fact that Plaintiff was treated by a physiatrist and rheumatologist for "chronic lumbar pain," Dr. Armstrong indicated that Plaintiff could:  occasionally lift up to 10 pounds; frequently lift less than 10 pounds; stand and walk for a maximum of fifteen minutes; sit for twenty to thirty minutes before changing position; and stand for ten minutes before changing position (*id.*).  Dr. Armstrong opined that Plaintiff must walk for five minutes every twenty to thirty minutes to relieve discomfort (*id.*).  In addition, Dr. Armstrong stated that Plaintiff would need to lie down at "unpredictable intervals" three times during an eight hour work day (*id.*).  Dr. Armstrong further indicated that, based on prior PT assessments, Plaintiff could never twist, stoop, crouch, or climb ladders and could climb stairs occasionally, but had no impediments to reaching, fingering, pushing and pulling, handling, and feeling (*id.* at 1030).  She should avoid moderate exposure to extreme cold and avoid concentrated exposure to fumes, odors, dust, gases,

perfumes, solvents, and cleaners (*id.*). According to Dr. Armstrong, Plaintiff's impairments would cause her to be absent from work more than four days per month (*id.*).

D.    Function Reports

Plaintiff completed a function report, with the assistance of another person, on October 28, 2014 (*id.* at 511, 518). According to the answers on the form, Plaintiff cared for her children and pets and did household chores with assistance from her husband and children (*id.* at 512, 513). She indicated that "constant pain" limited her ability to dress herself, bathe, and sleep well (*id.* at 512). She was able to prepare meals such as macaroni and cheese, sandwiches, and soup, but was not able to hold any heavy items (*id.* at 513). She shopped in stores, such as Wal-Mart, "when needed" and spent time with others (*id.* at 514, 515). She noted that she was able to shop and socialize with the assistance of a scooter (*id.* at 515). She had been using a cane since 2009 and a scooter since 2010 (*id.* at 517). According to the form, pain affected her ability to perform all listed functions except talking, seeing, and getting along with others (*id.* at 516). She indicated that she could walk 100 feet before needing to stop and rest for at least two minutes (*id.*).

Plaintiff's husband also completed a function report (*id.* at 526). He indicated that Plaintiff got the school-aged children ready for school, dropped them off, picked them up, helped them with their homework, bathed them, and got them ready for bed (*id.* at 526, 527, 530). According to Plaintiff's husband, notwithstanding Plaintiff's constant pain, she "d[id] her best" to do housework, laundry, and dishes, prepare meals, and care for the family's pets (*id.* at 526-28). He indicated that Plaintiff shopped once or twice a week for "most of the day" (*id.* at 529). His assessment of the limitations on Plaintiff's abilities was consistent with those that she noted on

her assessment form (*id.* at 531).  In the remarks section, Plaintiff's husband said, "She will not be able to do things on her own for much longer" (*id.* at 533).

Plaintiff submitted mental health treatment records from South Bay Community Services. On March 10, 2016, Plaintiff told her treatment provided, Leah Cohen, L.C.S.W., M.S.W., that she was planning a family vacation to Disney World for the fall of 2017 (*id.* at 1222).  On June 9, 2016, Plaintiff told Cohen that she was "keeping busy with camping trips and seeing friends" (*id.* at 1195).  On July 28, 2016, Plaintiff expressed her excitement about getting a new car and taking her children to the movies (*id.* at 1173).

E.      The ALJ Hearing

Plaintiff and independent vocational expert ("VE") Olds testified at the hearing before the ALJ on October 13, 2016 (*id.* at 133).  According to Plaintiff, her chronic lower back pain and fibromyalgia in her back, legs, and shoulders prevented her from working (*id.* at 139, 157, 159). In addition to the constant pain that fibromyalgia caused, Plaintiff testified that it caused her fingers and feet to swell (*id.* at 158).  She indicated that the injections that she received from Dr. Borowsky relieved the pain (*id.* at 140).  At best, her pain level was 5 on a scale of 10 (*id.* at 155).  However, it was usually a 7 or 8 (*id.* at 156).

Plaintiff told the ALJ that she did the cooking, laundry, and grocery shopping for the family (*id.* at 151).[5]  She used a riding cart to shop (*id.*).  Assistants from International Health Services came to the house for two hours each day to help with the cleaning, but she did "whatever they can't get to" (*id.*).

_____

[5] According to Plaintiff, her husband had done the cooking until he was involved in a "major car accident" and broke his right arm and right leg (A.R. at 150-51).

Plaintiff testified that she could sit for about ten minutes, could stand for about eight minutes, and could walk around a small block (*id.* at 155). She told the ALJ that sitting was "a little bit" less painful than standing and walking but all these activities exacerbated her back pain (*id.* at 160, 161). She indicated that the pain caused by plantar fasciitis with bone spurs in her right foot prevented her from walking an appreciable distance (*id.* at 156). She usually walked with a cane or used a scooter (*id.* at 160-61). She normally slept about four hours each night and tried to nap during the day, but was not always able to do so (*id.* at 162). She babysat for her granddaughter for about an hour at a time, although she stated that the child's mother was usually present (*id.* at 165).

In order to determine the VE's opinion of whether jobs existed in the national economy, the ALJ asked the VE to assume that a person had Plaintiff's age, education, and work experience, could occasionally lift 10 pounds and frequently lift less than 10 pounds, could stand and walk for two hours in an eight hour day, could sit for six hours but needed a sit/stand at will option, "defined as going from sitting to standing and standing to sitting without impacting productivity," could occasionally push and pull with the upper and lower extremities, could occasionally balance, but could not climb, stoop, kneel, crouch or crawl (*id.* at 166). In addition, the hypothetical person could not be exposed to temperature extremes, fumes, and hazards (*id.*). The ALJ asked VE Olds to further assume that the person was limited to unskilled work with low stress (occasional changes in the work setting) and occasional interaction with the public (*id.* at 166-67). VE Olds described two jobs that were available in the national and regional economies for the hypothetical individual: a hand packager; and a solderer (*id.* at 167). Both were classified as unskilled, light work that had jobs available at the sedentary exertional level

(*id.*).  However, those jobs would not be available to a person who was absent more than two days a month or who would be off task fifteen percent of the time (*id.* at 168).

F.   The ALJ's November 2016 Decision

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(i-v); *see also Goodermote*, 690 F.2d at 6-7.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of May 3, 2013 (A.R. at 113).  *See* 20 C.F.R. § 404.1571 *et seq.*  At step two, the ALJ found that Plaintiff had the following severe impairments: fibromyalgia, DDD, obesity, bursitis, migraines, asthma, plantar fasciitis, osteoarthritis, depression, and ADD (A.R. at 113).  *See* 20 C.F.R. § 404.1520(c).  For purposes of step three, Plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. at 118).  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at step four to determine whether she could perform past relevant work and, if the analysis continued to step five, to determine if she could do other work.  *See* 20 C.F.R. § 404.1520(e).  The ALJ determined that the Plaintiff had the RFC to perform sedentary work,[6] with the following limitations:

---

[6] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

She needs the option to sit or stand at will, defined as going from sitting to standing and from standing to sitting without impacting productivity. She can occasionally perform pushing/pulling with her upper and lower extremities. She can occasionally balance. She can never climb, stoop, kneel, crouch, or crawl. She must avoid exposure to temperature extremes, fumes, dusts, gases, poor ventilation, and hazards such as unprotected heights and dangerous moving machinery. She is limited to unskilled work. She can perform low stress work, defined as no more than occasional changes in work setting. She can tolerate no more than occasional interaction with the general public.

(A.R. at 120). At step four, the ALJ found that Plaintiff was unable to perform her past relevant work (*id.* at 122). *See* 20 C.F.R. § 404.1565. However, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform the jobs of packager and solderer, which existed in the national and regional economies (A.R. at 123-24). See 20 C.F.R. §§ 404.1569, 404.1569a. Consequently, the ALJ concluded that Plaintiff was not disabled from May 3, 2013 through November 29, 2016, the date of the decision under review (A.R. at 124). *See* 20 C.F.R. § 404.1520(g).

IV.    ANALYSIS

Plaintiff alleges that the ALJ erred by: (1) failing to afford Dr. Armstrong's opinions controlling weight; and (2) failing to give Dr. Armstrong's opinions the same weight afforded to them in the first decision in February 2016. Each of Plaintiff's objections will be addressed in turn.

A.    Substantial evidence supports the ALJ's decision to give "no weight" to the opinions of Plaintiff's treating physician, Dr. Armstrong.

Plaintiff mostly complains that the ALJ assigned "no weight" to the opinions of her PCP, Dr. Armstrong, who was a treating source.[7] In rejecting Dr. Armstrong's opinions that Plaintiff was disabled, the ALJ determined that Dr. Armstrong's opinions were inconsistent with other

_____

[7] There is no dispute that Dr. Armstrong was a "treating source" as defined by 20 C.F.R. § 404.1527(a)(2).

record evidence (A.R. at 122). Further, the ALJ faulted Dr. Armstrong for relying "heavily on the subjective report of symptoms and limitations provided by [Plaintiff]" (*id.*). The ALJ's determination is supported by substantial evidence.

At the outset, the ALJ properly rejected Dr. Armstrong's March 2015 opinion that Plaintiff's lumbar DDD and fibromyalgia prevented her "from engaging in any substantial gainful activity, in any field of work" (*id.* at 832). "The ultimate decision of whether a claimant is disabled is not a medical opinion but, rather, administrative in nature, and, therefore, is reserved to the Commissioner." *Cook v. Berryhill*, CIVIL ACTION NO. 14-40112-DHH, 2017 WL 1135221, at *11 (D. Mass. Mar. 27, 2017) (citing 20 C.F.R. 404.1527(d)(1)). Consequently, "'the opinion of a treating physician that a claimant is unable to work is entitled to no deference at all (as it is not a medical opinion).'" *Foley v. Astrue*, Civil Action No. 09-10864-RGS, 2010 WL 2507773, at *8 (D. Mass. June 17, 2010) (quoting *Morales-Alejandro v. Med. Card Sys., Inc.*, 486 F.3d 693, 700 n.7 (1st Cir. 2007)); *see also* SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). Therefore, the ALJ was permitted to reject that portion of Dr. Armstrong's opinion.

In addition to rejecting Dr. Armstrong's March 2015 opinion that Plaintiff was not able to work, the ALJ also gave "no weight" to Dr. Armstrong's opinion that Plaintiff was unable to stand or walk for more than ten minutes, to sit for more than fifteen minutes, and to lift more than fifteen pounds (A.R. at 832).[8] "[T]he ALJ is not 'obligated automatically to accept' the

---

[8] Dr. Armstrong's opinions differed from the RFC only in the evaluation of Plaintiff's exertional limitations; that is, her capacity to sit, stand, and walk. *See* 20 C.F.R. § 404.1569a. *Compare* A.R. 120 *with* A.R. 832, 1029-30. In January 2016, Dr. Armstrong opined that some of Plaintiff's exertional limitations were less severe than they were in March 2015. For example, in March 2015, Dr. Armstrong indicated that Plaintiff could stand or walk for up to ten minutes and could sit for up to fifteen minutes (id. at 832). In January 2016, however, Dr. Armstrong stated that Plaintiff could stand and walk for up to fifteen minutes and could sit for up to thirty minutes before changing position (id. at 1029). Because Dr. Armstrong's March 2015 opinion shows that Plaintiff's impairments were slightly more severe than they were in January 2016, the court

21

treating physicians' opinions." *Ross v. Colvin*, Civil Action No. 13-11089-PBS, 2014 WL

587849, at *6 (D. Mass. Feb. 14, 2014) (quoting *Guyton v. Apfel,* 20 F. Supp. 2d 156, 167 (D.

Mass. 1998)).  *See Arroyo v. Sec'y of Health & Human Servs.,* 932 F.2d 82, 89 (1st Cir. 1991)

("The law in this circuit does not require ALJs to give greater weight to the opinions of treating

physicians.").  "A treatment provider's opinion is entitled to controlling weight if the opinion is

'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record.'" *Ross*, 2014 WL 587849, at

*6 (quoting 20 C.F.R. § 404.1527(c)(2)).  However, "the ALJ is entitled 'to downplay the weight

afforded a treating physician's assessment of the nature and severity of an impairment where . . .

it is internally inconsistent or inconsistent with other evidence in the record including treatment

notes and evaluations by examining and nonexamining physicians.'" *Arrington v. Colvin*, 216 F.

Supp. 3d 217, 240 (D. Mass. 2016), *aff'd sub nom. Arrington v. Berryhill,* No. 17-1047, 2018

WL 818044 (1st Cir. Feb. 5, 2018) (quoting *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D.

Mass. 2004)).  "Where the ALJ does not give the treating physician's opinion controlling weight,

as was the case here, the ALJ may consider 'an array of factors' in deciding how to weigh the

physician's opinion." *Deane v. Colvin*, 247 F. Supp. 3d 152, 167 (D. Mass. 2017) (quoting

*Arrington*, 216 F. Supp. 3d at 240); *see also Bourinot v. Colvin*, 95 F. Supp. 3d 161, 175–76 (D.

Mass. 2015).  Those factors include "'the degree to which the opinion can be supported by

relevant evidence, and the consistency of the opinion with the record as a whole.'" *Arrington*,

216 F. Supp. 3d at 240 (quoting *Bourinot*, 95 F. Supp. 3d at 176).  "The ALJ is not required to

---

mainly references Dr. Armstrong's March 2015 opinion.  In other words, if the ALJ did not err
by assigning "no weight" to Dr. Armstrong's March 2015 opinion, she did not err by assigning
"no weight" to her January 2016 opinion, which found that Plaintiff functioned at a slightly
higher level than in March 2015.

explicitly list these factors, but must provide 'good reasons' for the weight assigned to a treating physician's medical opinion." *Id.* *See* 20 C.F.R. § 404.1527(c)(2) (listing factors considered in assigning weight to a medical opinion).

The ALJ articulated her reasons for rejecting Dr. Armstrong's opinions regarding Plaintiff's physical limitations and the ALJ's decision is supported by substantial evidence (A.R. at 122). *See* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.").[9]  She determined that they were inconsistent with:  the state agency consultants' opinions; "the objective medical findings;" [Plaintiff's] wide range of daily activities; and Dr. Armstrong's advice to Plaintiff regarding preservation of her remaining function and muscle tone (A.R. at 122).  In addition, the ALJ disregarded Dr. Armstrong's opinion because it "relied heavily" on Plaintiff's self-report of symptoms and limitations (*id.*).  *See Martel v. U.S. Soc. Sec. Admin., Comm'r*, Civil No.13-cv-48-PB, 2013 WL 6068241, at *12 (D.N.H. Nov. 18, 2013) ("The ALJ was entitled to come to a contrary conclusion in light of the [treating source's] opinions' inconsistencies with the record evidence of daily living, their reliance upon the subjective complaints of the less than fully credible claimant, and their general inconsistency with the treatment notes.").  The evidence supporting each of the ALJ's reasons for rejecting Dr. Armstrong's opinion is discussed below.

     1.     The state agency consultants' opinions were inconsistent with Dr. Armstrong's.

---

[9] SSR 96-2p's rescission was effective on March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298, at *1 (Mar. 27, 2017).  Plaintiff filed her claim before that date (A.R. at 454).

First, Dr. Armstrong's opinions were inconsistent with the RFC opinions of the state agency consultants. *See Harding v. Colvin*, Civil Action No. 12-11437-DJC, 2015 WL 8082386, at *11 (D. Mass. Dec. 7, 2015) (quoting *Hill v. Colvin*, Civil Action No. 13-11497-DJC, 2015 WL 132656, at *9 (D. Mass. Jan. 9, 2015)) ("The opinions of 'nontreating, nonexamining sources may override treating doctor opinions, provided there is support for the result in the record.'") (citation and internal quotation marks omitted); 20 C.F.R. § 404.1527(c)(4) ("[T]he more consistent a [treating physician's] medical opinion is with the record as a whole, the more weight [is given] to that medical opinion."). Plaintiff does not challenge the ALJ's assignment of "great weight" to the assessments of the state agency consulting examiners (A.R. at 122). In November 2014, Dr. Weeratne reviewed Plaintiff's medical records, including the records of Dr. Shapiro of Baystate Neurosurgery, Dr. Tannoury of Boston Medical Center, and Dr. Valentin of the Arthritis Treatment Center (*id.* at 241, 242). Dr. Weeratne opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk and sit, with normal breaks, for about six hours in an eight hour work day; and push and/or pull without limitation (*id.* at 246-47). Dr. Bronstein reviewed Plaintiff's records, including those of PSSP, and agreed with Dr. Weeratne's assessments in March 2015, the same month Dr. Armstrong rendered her first opinion (*id.* at 271, 273, 279, 832). Because Dr. Armstrong's diagnosis of lumbar DDD, fibromyalgia, and "chronic lumbar pain" relied on Plaintiff's description of her symptoms and limitations and the fact that she was "followed by physiatry and rheumatology," there is no indication that Dr. Armstrong's opinions were based on a review of specialists' records or radiological studies (*id.* at 832, 1029). In fact, Dr. Armstrong diagnosed lumbar DDD notwithstanding the fact that no specialist had offered that diagnosis and a November 2015 study of Plaintiff's lumbar region showed "no significant [DDD]" (*id.* at 832, 1082). *See* SSR 96-6p,

1996 WL 374180, at *3 (July 2, 1996) ("[T]he opinion of a State agency medical . . . consultant . . . may be entitled to greater weight than a treating source's medical opinion if the State agency medical . . . consultant's opinion is based on a review of the complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.").

Although Dr. Armstrong's opinions regarding Plaintiff's physical capabilities were inconsistent with the state agency consultants' opinions, it is notable that Plaintiff's RFC was more restrictive than the state agency consultants' assessments of her limitations (A.R. at 120, 246-47, 279). The consultants found that Plaintiff could perform light work (*id.* at 250-51), while the RFC assessment limited Plaintiff to performing sedentary work, which involved "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools," 20 C.F.R. § 404.1567(a), and included "the option to sit or stand at will" (*id.* at 120).

2. The objective medical evidence was inconsistent with Dr. Armstrong's opinion.

The objective medical evidence -- the results of multiple MRIs or x-rays of Plaintiff's lumbar region – provided the second reason for the ALJ's decision to afford "no weight" to Dr. Armstrong's opinion (*id.* at 122). *See Haggard v. Apfel,* 175 F.3d 591, 595 (8th Cir. 1999) ("[A] treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion itself."); *Botelho v. Colvin*, 153 F. Supp. 3d 451, 461 (D. Mass. 2015) (treating physician's opinion was not given controlling weight because it was inconsistent with the objective medical evidence). The radiological studies showed that Plaintiff's lumbar

spine, including her sacroiliac joints and sacrum, was "predominantly normal" (A.R. at 114, 115, 610, 614, 616, 670-71, 827, 921, 1058, 1082-83). In addition to "no significant degenerative disc disease," there was no disc herniation, "no compression of any sort anywhere," and mild caudal facet arthropathy (*id.* at 671, 726, 827, 921, 1082). Back specialists did not recommend surgery (*id.* at 615, 671).

        3.     Plaintiff's activities of daily living were inconsistent with Dr. Armstrong's opinions.

Next, Dr. Armstrong's assessment of Plaintiff's ability to perform work-related activities on a sustained basis contradicted Plaintiff's "wide range of daily living activities" (A.R. at 119, 122). *See Johnson v. Colvin,* 204 F. Supp. 3d 396, 410 (D. Mass. 2016) ("plaintiff's own reports of her ability to perform activities of daily living" was one factor supporting the ALJ's rejection of the treating source's opinion). On July 22, 2014, Plaintiff spent two hours face-to-face with the interviewer in the SSA's district office while completing the application for benefits (A.R. at 509-10). The interviewer observed that Plaintiff sat, stood, walked, and cared for two children without difficulty and without demonstrating "much discomfort" (*id.* at 509). The records of Plaintiff's September 28, 2015 and January 21, 2016 visits to PSSP stated that Plaintiff's "current opiate regime" permitted her to "ambulate independently and perform simple and instrumented tasks of daily living independently" (*id.* at 933, 1075). In June 2016, Plaintiff told her mental health counselor that she had gone on "camping trips" (*id.* at 1195). Plaintiff's husband indicated that Plaintiff cared for the children and family pets, did housework, laundry, dishes, prepared meals, and shopped "most of the day" once or twice a week (*id.* at 526-30). In October 2016, Plaintiff testified that the injections she received from Dr. Borowsky relieved her pain and that she cooked, did the laundry, went food shopping for the family by using a riding cart, and

babysat (*id.* at 140, 151, 165).  Because Plaintiff's activities contradicted Dr. Armstrong's

assessment, the ALJ was warranted in not affording Dr. Armstrong's opinion controlling weight.

*See* 20 C.F.R. § 404.1527(c)(4).

            4.     Dr. Armstrong's treatment notes were inconsistent with her opinions.

The ALJ also pointed out that Dr. Armstrong's assessment of Plaintiff's limited functional

capability contradicted the doctor's own repeated advisements that Plaintiff needed to "remain

active" and to engage in a low-impact form of exercise several times per week to maintain her

existing joint function and muscle tone (A.R. at 122, 766, 1367).  *See Bourinot*, 95 F. Supp. 3d at

177-78 (the ALJ discounted the treating source's opinion because it was inconsistent with the

source's own treatment notes); *Lopes v. Barnhart*, 372 F. Supp. 2d 185, 194 (D. Mass. 2005)

(same).

            5.     The ALJ did not err by rejecting Dr. Armstrong's opinions because they
                  were based on Plaintiff's descriptions of the intensity of her pain,
                  including the pain caused by fibromyalgia, which were not supported by
                  the record evidence.

Finally, the ALJ also observed that Dr. Armstrong's opinions were undercut by the fact

that she "uncritically accepted" Plaintiff's subjective complaints of pain (A.R. at 122).  The ALJ

found that Plaintiff's descriptions of her symptoms and, thus, Dr. Armstrong's opinions regarding

Plaintiff's limitations, were inconsistent with the record evidence (*id.*).  This determination is

supported by substantial evidence.

"In determining whether [an individual] is disabled, [the ALJ] consider[s] all . . .

symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(a).  A

"symptom" is defined as "the individual's own description or statement of his or her physical or

mental impairment(s)." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017).[10] The ALJ's

analysis must follow a two-step process. *See id.* First, the ALJ "considers whether there is an

underlying medically determinable impairment that could reasonably be expected to produce an

individual's symptoms, such as pain." *Id.* at *3. At the second step, the ALJ

> must "evaluate the intensity and persistence of an individual's symptoms such as pain and
> determine the extent to which an individual's symptoms limit his or her ability to perform
> work-related activities." . . . [I]n conducting that inquiry, the ALJ must "examine the
> entire case record, including the objective medical evidence; an individual's statements
> about the intensity, persistence, and limiting effects of symptoms; statements and other
> information provided by medical sources and other persons; and any other relevant
> evidence in the individual's case record."

*Coskery*, 892 F.3d at 4 (quoting SSR 16-3p, 2017 WL 5180304, at *4).

Here, at step one, the ALJ determined that Plaintiff's "medically determinable

impairments [including lumbar DDD and fibromyalgia] could reasonably be expected to cause

the alleged symptoms" (A.R. at 120). At step two, the ALJ determined that Plaintiff's

"statements concerning the intensity, persistence and limiting effects of these symptoms are not

supported by the objective medical evidence of record to the extent alleged" (*id.*). The ALJ

found that Plaintiff's statements were inconsistent with the radiology findings, her daily living

activities, "her history of no-shows to appointments," and her noncompliance with treatment

---

[10] ALJs were directed to use SSR 16-3p instead of SSR 96-7p when making determinations and
decisions regarding a claimant's symptoms on or after March 28, 2016. *See* SSR 16-3p, 2017
WL 5180304, at *1, 13 & n.27. The ALJ made the decision under review on November 29,
2016 (A.R. at 124). The only significant difference between SSR 96-7p and SSR 16-3p is the
elimination of the term "credibility" from the new ruling. *See Coskery v. Berryhill*, 892 F.3d 1, 4
(1st Cir. 2018) (quoting SSR 16-3p, 2017 WL 5180304, at *2 & n.1) ("Following concerns
raised by the Administrative Conference of the United States about symptom evaluation under . .
. SSR [96-7p] . . . the SSA decided to 'eliminat[e] the use of the term "credibility" from [the] sub-
regulatory policy' to make clear that a 'subjective symptom evaluation is not an examination of
an individual's character.'") (third alteration in original).

recommendations (*id.* at 121-22). *See* 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, *6, *7 (evaluation of subjective symptoms involves consideration of objective medical evidence, statements of agency personnel, opinions of state agency consultants, activities of daily living, and compliance with treatment). The previously discussed opinions of the state agency consultants, the objective medical evidence, and Plaintiff's daily living activities, including the SSA interviewer's observations, provide substantial support for the ALJ's finding regarding the intensity and persistence of Plaintiff's symptoms.

The record also supports the ALJ's determination that Plaintiff failed to comply with treatment recommendations.

> . . . SSR [16-3p] does not preclude an ALJ, in assessing the claimant's symptoms, from considering whether a claimant has complied with treatment for the pain that the claimant purports to be suffering. In accord with the common-sense notion that a person who does not follow a course of treatment for pain may not be suffering from that pain as intensely as the person claims, SSR 16–3p expressly provides that an ALJ must "consider an individual's attempts . . . to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult or the ability to function independently."

*Coskery*, 892 F.3d at 6 (quoting SSR 16-3p, 2017 WL 5180304, at *9). *See Stimson v. Astrue*, Civil Action No. 10-30193-KPN, 2011 WL 6132025, at *5 (D. Mass. Dec. 1, 2011) (ALJ considered plaintiff's noncompliance with treatment in assessing his subjective statements). Plaintiff had a history of failing to comply with recommendations to exercise, participate in a weight loss program, and engage in PT to relieve her back pain and fibromyalgia symptoms (A.R. at 614, 618, 671, 726-27, 739, 766, 817, 918, 933, 955, 1067, 1071, 1074, 1140, 1367). In January 2016, Plaintiff provided different excuses for her absences from PT sessions: she told Dr. Armstrong that she had not attended sessions because of "transportation and insurance issues (*id.* at 1095); about two weeks later, she told the PSSP therapist that she missed PT sessions

because she was ill (*id.* at 1073). Further, Plaintiff, on her own, stopped taking sulindac, which was prescribed for relief from fibromyalgia (*id.* at 724, 728, 739).

In view of Plaintiff's diagnosis of fibromyalgia, Plaintiff, citing *Johnson v. Astrue*, 597 F.3d 409 (1st Cir. 2009), alleges that the ALJ erred by relying on the objective medical evidence when weighing Dr. Armstrong's opinion of Plaintiff's functional capacity (Dkt. No. 14 at 16-17). Plaintiff's argument is flawed in several respects. First, although Dr. Armstrong's March 2015 assessment of Plaintiff's physical limitations was based on both lumbar DDD and fibromyalgia, the doctor's January 2016 opinion was based only on "chronic lumbar pain" (A.R. at 832, 1029). In *Johnson*, on the other hand, the treating physician's opinion was based solely on fibromyalgia. *See Johnson*, 597 F.3d at 410-11; *see also Grivois v. Colvin*, No. 1:14-cv-68-JHR, 2015 WL 1757152, at *3 (D. Me. Apr. 17, 2015) ("[T]he plaintiff does not make a persuasive case that the [ALJ] erroneously discounted his fibromyalgia solely on the basis of a lack of objective medical findings. . . . [T]he [ALJ] properly considered a lack of objective findings in that the plaintiff suffered not only from fibromyalgia but also from degenerative disc disease, and even the plaintiff was not sure which of those conditions was causing his pain."). Because both of Dr. Armstrong's opinions considered Plaintiff's lumbar DDD, the ALJ was permitted to weigh the objective medical evidence concerning that condition. *See, e.g., Sastre v. Astrue*, 870 F. Supp. 2d 267, 280 (D. Mass. 2012).

Moreover, the ALJ in *Johnson* "erred by 'requiring objective evidence beyond the clinical findings necessary for a *diagnosis* of fibromyalgia under established medical guidelines.'" *Coe v. Colvin*, Civil Action No. 15-30037-MGM, 2016 WL 3350995, at *7 (D. Mass. June 15, 2016) (quoting *Johnson*, 596 F.3d at 412). Here, however, the ALJ accepted Plaintiff's diagnosis and treatment for fibromyalgia, included fibromyalgia as a severe impairment at step two, and

incorporated Plaintiff's fibromyalgia-related limitations into the RFC (A.R. at 113, 114, 119-20). *See id.*

Although "some objective evidence is necessary in order to determine the severity of a plaintiff's fibromyalgia to support a finding of disability," *Coe*, 2016 WL 3350995, at *7, the ALJ did not rely exclusively on the objective medical evidence to evaluate Plaintiff's statements regarding the "intensity and persistence of [her] pain and other symptoms." SSR 12-2p, 2012 WL 3104869, at *5 (July 25, 2012). Instead, at the second step of the two-step symptom evaluation process described in SSR 12-2p and SSR 16-3p, [11] the ALJ considered "all of the evidence in the case record," including Plaintiff's daily activities, medications or other treatments she used, or had used, to alleviate symptoms; the nature and frequency of her attempts to obtain medical treatment for symptoms and whether she followed prescribed treatment; and statements by other people about her symptoms." *See* SSR 16-3p, 2017 WL 5180304, at *5-10; SSR 12-2p, 2012 WL 3104869, at *5. Based on these factors, the ALJ determined that Plaintiff's symptoms did not limit her ability to perform work-related activities to the extent she described (A.R. at 121-22). *See Coe*, 2016 WL 3350995, at *8 (quoting *Howcroft v. Colvin*, C.A. No. 15-201S, 2016 WL 3063858, at *10 (D.R.I. Apr. 29, 2016)) ("Even more so than in other contexts, 'the "credibility determination is a vital piece of the puzzle and therefore critical to the outcome"' of

---

[11] SSR 12-2p directs ALJs to undertake the two-step analysis described in SSR 96-7p. *See* SSR 12-2p, 2012 WL 3104869, at *5. As noted earlier, SSR 96-7p was rescinded and superseded by SSR 16-3p for ALJs' decisions issued after March 28, 2016. *See* SSR 16-3p, 2017 WL 5180304, at *1. Because "SSR 16-3p is a clarification of the previous ruling rather than a substantive change," *Nunes v. Berryhill*, Civil No. 16-CV-11499-LTS, 2017 WL 4169748, at *2 (D. Mass. Sept. 20, 2017), the ALJ's two-step analysis of Plaintiff's subjective symptoms under SSR 16-3p, which was discussed earlier, applies to the evaluation of her subjective fibromyalgia symptoms.

fibromyalgia cases.").  The ALJ then incorporated her assessment of the severity of Plaintiff's symptoms into the RFC by modifying the determination of Plaintiff's ability to perform sedentary work to include an option that would permit her to sit or stand at will (A.R. at 119-20). *See Coe*, 2016 WL 3350995, at *6 (the RFC included a sit/stand option to accommodate plaintiff's fibromyalgia); SSR 12-2p, 2012 WL 3104869, at *6.  In addition, to accommodate Plaintiff's difficulty with memory and concentration that were symptomatic of fibromyalgia, the RFC limited Plaintiff to performing "unskilled[,] . . . low stress work" with "only occasional changes in work setting" (A.R. at 119-20).  *See* 20 C.F.R. § 416.968(a) ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.").  Plaintiff fails to sustain her burden of establishing that the RFC was not warranted by substantial evidence.

It was up to the ALJ to resolve conflicts in the evidence.  *See Irlanda Ortiz*, 955 F.2d at 769.  The court finds that the ALJ reasonably afforded no weight to Dr. Armstrong's opinions, and sufficiently explained the reasons for her decision.  Accordingly, Plaintiff presents no basis for relief on this issue.

      B.      <u>The ALJ was not bound by her February 2016 decision</u>.

Plaintiff contends that, in November 2016, the ALJ was bound to give Dr. Armstrong's opinions the same weight that she assigned to them in her February 2016 decision, which the Appeals Council remanded.  Plaintiff's argument is not supported by the law.

On February 25, 2016, the ALJ determined that Plaintiff was not disabled (*id.* at 314). The ALJ found Plaintiff's had the RFC to perform light work[12] with the following additional limitations:

> she [could lift[] up to 10 pounds frequently and 20 pounds occasionally. She [could] sit six hours in an eight-hour workday and stand/walk four hours in an eight-hour workday, but she would need to be able to sit/stand at, at will. [She was] limited to occasional lower extremity pushing and pulling, climbing, balancing, and stooping, and she could never perform kneeling, crouching, and crawling. [Plaintiff] would need to avoid any exposure to fumes and hazards. [She was] limited to unskilled work and low stress work, defined as occasional changes in the work setting. She [was] limited to no interaction with the public.

(*id.* at 306-07). The ALJ afforded Dr. Armstrong's opinions "great weight, to the extent they [were] consistent with the [RFC]" described in the opinion (*id.* at 312).

The Appeals Council remanded the case to the ALJ with directions to "indicate the portions of [Dr. Armstrong's March 15, 2015] opinion that are consistent with the [RFC]" and to "[g]ive further consideration to [Dr. Armstrong's] opinion" because "[t]he limitations assessed by Dr. Armstrong appear more restrictive than the limitations assessed in the decision['s] [RFC] finding" (*id.* at 322). The ALJ was instructed to explain the weight she gave to Dr. Armstrong's opinion and to reference the record evidence that supported the RFC (*id.* at 323).

---

[12] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

In accordance with the Appeals Council's order, the ALJ revised the weight she assigned to Dr. Armstrong's opinion and explained her reasons for giving it "no weight" (*id.* at 122).  *See* 20 C.F.R. § 404.977(b) (On remand, "[t]he administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order.").  The ALJ was not bound to adopt her prior assessment of Dr. Armstrong's opinion.  *See* 20 C.F.R. § 404.955(a) (the decision of an ALJ is not binding if the claimant requests a review by the Appeals Council and the Appeals Council reviews the case).  The ALJ's decision to afford "no weight" to Dr. Armstrong's opinion is supported by substantial evidence, as previously discussed,   By assigning "no weight" to Dr. Armstrong's assessment of Plaintiff's exertional limitations, the ALJ eliminated the inconsistency between Dr. Armstrong's opinions and the RFC.

In addition to revising the weight she afforded to Dr. Armstrong's opinion, the ALJ crafted a new RFC, which was more favorable to Plaintiff than the first one.  In contrast to the earlier determination that Plaintiff could engage in light work, in November 2016, the ALJ determined that Plaintiff could perform sedentary work with additional limitations on sitting, standing, and walking (*id.* at 119-20).  "[W]hen an initial ALJ's decision is vacated and remanded by the Appeals Council, as here, the ALJ is typically directed to issue a 'a new decision' after offering the claimant 'a new hearing.'"  *Nichols v. U.S. Soc. Sec. Admin., Acting Comm'r*, Case No. 16-cv-443-PB, 2018 WL 1307645, at *5 (D.N.H. Mar. 13, 2018) (citing SSA Hearings, Appeals & Litigation Law Manual ("HALLEX") § I–2–8–18(A), 1993 WL 643058 (May 26, 2017)).  "Unless otherwise ordered by the Appeals Council, this necessarily includes a new RFC finding." *Id.*  "Although an ALJ in receipt of a remand order is required to take whatever action the Appeals Council orders therein, [s]he is also free to 'take any additional

action [that is] not inconsistent with [that] order.'" *Id.* (second and third alterations in original) (quoting *Gibbs v. Barnhart*, 130 Fed. App'x. 426, 430 (11th Cir. 2005)). *See* 20 C.F.R. § 404.977(b). "Indeed, the ALJ 'is encouraged to review "the record on remand, check[] initial findings of fact and mak[e] corrections, if appropriate."'" *Nolan v. Colvin*, Civil Action Number 4:15-cv-00935-AKK, 2016 WL 1719671, at *4 (N.D. Ala. Apr. 29, 2016) (quoting *Russ v. Astrue*, No. 3:07-cv-1213-J-MCR, 2009 WL 764516, at *6 (M.D. Fla. Mar. 20, 2009) (alterations in original)). Where the ALJ's new RFC determination was supported by substantial evidence, the fact that it deviated from the prior decision is not a basis for modification or reversal of the ALJ's decision. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1223–24 (10th Cir. 2004) (ALJ re-examining a record upon remand may "certainly" revise a claimant's RFC category, so long as the revised decision is supported by substantial evidence).

## V.   CONCLUSION

For the above-stated reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 13) is DENIED and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Dkt. No. 15) is GRANTED. The case will be closed.

It is so ordered.

Dated: September 10, 2018                                    /s/ Katherine A. Robertson
                                                             KATHERINE A. ROBERTSON
                                                             U.S. MAGISTRATE JUDGE